## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

HAZAA SHAHIT and MOHAMED
ELMATHIL,

       Plaintiffs,                          CASE NO. 04-71538
                                              HON. LAWRENCE P. ZATKOFF

v.

CITY OF DETROIT POLICE OFFICER
ARIC TOSQUI (Badge #2827) and CITY
OF DETROIT POLICE OFFICER MICHAEL
PARISH (Badge #4436), jointly and severally,

       Defendants.

_____/

### OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Detroit, State of Michigan, on 6/1/05

PRESENT:  THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment.  The motion

has been fully briefed.  The Court finds that the facts and legal arguments are adequately presented

in the parties' papers and the decisional process would not be significantly aided by oral argument.

Therefore, pursuant to E.D. MICH. L.R. 7.1(e)(2), it is hereby ORDERED that the motion will be

resolved on the briefs submitted.  For the reasons set forth below, Defendants' motion for summary

judgment will be GRANTED.

## II.  BACKGROUND

This matter involves the alleged wrongful arrest and detainment of two Arab-American men by two City of Detroit Police Officers. Plaintiffs Hazaa Shahit and Mohamed Elmathil claim that Defendants Aric Tosqui and Michael Parish stopped them without reasonable suspicion and arrested them without probable cause on the basis of their race. Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1985.

## A.   Parties

Plaintiff Shahit is an American-born male of Arab descent with a Masters Degree in Business Administration from Wayne State University. Plaintiff Elmathil was born in Yemen and is a naturalized American citizen. According to Plaintiffs, they live across the street from each other in a Dearborn neighborhood. Defendant Aric Tosqui has been a Detroit police officer since 1996, and Defendant Michael Parish has been a Detroit police officer since 2000. Both Defendants were assigned to patrol the Third Precinct in southwest Detroit during the events in question.

## B.   Facts

On April 20, 2003, at approximately 7:00 p.m., Plaintiff Shahit and Plaintiff Elmathil were traveling northbound on the service drive of I-75 approaching West Vernor road in a late model Cadillac owned by Mr. Jahaf, an alleged friend of Plaintiff Elmathil's.[1] Plaintiffs allege that they went for a drive that day to test a camcorder that had been purchased by Mr. Jahaf. According to Plaintiffs, Plaintiff Elmathil decided to let Plaintiff Shahit drive the Cadillac while Plaintiff Elmathil tested the camcorder. Plaintiffs allege that they were traveling east on Michigan Avenue until they decided to head back to Dearborn by turning north onto the I-75 service drive.

Defendants Tosqui and Parish were patrolling the area that evening and traveling west on

_____

[1] Mr. Jahaf's first name is not mentioned in the parties' papers.

2

West Vernor.  According to Defendants, Defendant Tosqui was driving and Defendant Parish was filling out an Activity Log as the squad car approached the intersection of the I-75 service drive and West Vernor.  It is undisputed that the intersection is near the Ambassador Bridge.  Defendant Tosqui alleges that as Plaintiffs turned left to proceed west on West Vernor, he observed the passenger, Plaintiff Elmathil, operating a camcorder and aiming it at the squad car.  Defendants further allege that Defendant Parish looked up and saw that Plaintiff Elmathil was holding a camcorder, but by that time Plaintiff Elmathil appeared to be aiming the camcorder through the front windshield.  Plaintiff Elmathil maintains that Defendants could not have seen the camcorder because he stopped using it before entering the intersection and had placed it either on the back seat or the floor.  *See* Elmathil Supp. Aff. at ¶¶ 2-3.  Defendants allege that they were under a heightened security alert that evening and, furthermore, that they had received specific reports that the Ambassador Bridge was a possible terrorist target.

Defendants began following Plaintiffs down West Vernor and they noticed that the rear windows in the Cadillac were tinted.  Michigan law allows dark tinted windows in the rear of a vehicle, but prohibits tinted windows that have a solar reflectance level of thirty-five percent or more.[2]  Defendants allege that although it was late in the day and overcast, they thought the solar reflectance of the windows exceeded thirty-five percent.  Defendant Tosqui activated the squad car's

---

[2] Sec. 709 (1) A person shall not drive a motor vehicle with any of the following:

                \*        \*        \*

    (b) A rear window or side window to the rear of the driver composed of, covered by, or treated with a material that creates a total solar reflectance of 35% or more in the visible light range, including a silver or gold reflective film.

                \*        \*        \*

MICH. COMP. LAWS § 257.709(1)(b).

3

overhead lights and stopped Plaintiffs allegedly because of the tinted windows and the peculiar use of the camcorder near the Ambassador Bridge.  A video camera inside the squad car recorded the stop and Plaintiffs' ultimate arrest.

The in-car video shows that both Defendants exited the squad car.  Defendant Tosqui approached the driver's door and Defendant Parish approached the passenger's door.  Defendant Tosqui asked the driver, Plaintiff Shahit, to roll down his rear window.  Defendants allege that upon approaching the vehicle they realized that Plaintiffs were of Arab descent.  Plaintiffs allege that at this point Defendant Tosqui must have seen the camcorder for the first time.

Defendant Tosqui asked Plaintiff Shahit for his driver's license, vehicle registration, and proof of insurance.  Plaintiff Shahit explained that the car was not his, but instead belonged to Plaintiff Elmathil.[3]  Plaintiff Shahit stated that he was driving because Plaintiff Elmathil wanted to test the camcorder, which Plaintiff Shahit alleged was a recent purchase.  Plaintiff Shahit asked if it was illegal to film while driving and Defendant Tosqui replied that it was legal, but "odd."  Defendant Tosqui also asked if Plaintiff Shahit had a doctor's note for the tinted windows, and Plaintiff Shahit replied that he did not, though he stated that he wore dark glasses day and night because of his sensitivity to light.  Plaintiff Shahit also stated that "with all that's going on, I can see now why you pulled us over."

Upon reviewing the Cadillac's registration, Defendant Tosqui realized that Plaintiff Elmathil was not the owner of the Cadillac.  When he inquired further, Plaintiff Shahit stated that the car belonged to a friend of Plaintiff Elmathil's, who is apparently Mr. Jahaf, the registered owner.

---

[3]  Some of Plaintiff Shahit's answers to Defendant Tosqui's questions are inaudible in the squad car video.

4

Defendant Parish stood on the other side of the car during the questioning and he was not able to hear Plaintiff Shahit's responses to Defendant Tosqui's questions. Defendant Tosqui asked Plaintiff Shahit for the keys to the car and both Defendants returned to the squad car.

Upon returning to the squad car, Defendant Tosqui can be heard stating that Plaintiffs were not "going anywhere." He mentioned that the Cadillac was not registered to either Plaintiff. Defendant Tosquit also explained to Defendant Parish that the Plaintiffs were Arabic males from Dearborn and that they were near the Ambassador Bridge videotaping. In his deposition, Defendant Tosqui admitted that Plaintiffs' ethnicity played a role in his decision to investigate:

> Q.    And did you feel that it was relevant to report that the people you saw near the bridge with a camcorder were Arabic?
>
> A.    Absolutely.
>
> Q.    And why?
>
> A.    Because all of the information that was put out prior to that time. All the descriptions that were given out by the federal government indicated that the appearance and possible modus operandi that would happen in case of a subsequent attack.
>
> Q.    So in your mind the fact that they were Arabic was significant to you?
>
> A.    It became significant after I found that out, coupled with the other information I found out at the time.
>
> *          *          *
>
> Q.    Why was it relevant to you that they were Arabic?
>
> A.    As I said, the information we received by the federal government regarding what the individuals responsible for the attacks in September and possible individuals that may match descriptions to watch out for, coupled with the other information received at the time of the stop made that significant.

5

Tosqui Dep. at 22; 24.  When asked whether he would have stopped two Irish or Italian individuals in the same circumstances, Defendant Tosqui answered that he would have stopped them for the same reasons - the window tint and use of the camcorder.  *See* Tosqui Dep. at 22-23.  Unlike Defendant Tosqui, Defendant Parish steadfastly denied that Plaintiffs' race or ethnicity was relevant. *See* Parish Dep. at 46.

After informing Defendant Parish of the relevant facts, Defendant Tosqui used his cellular phone to contact his supervisor.  He informed the supervisor that he "observed these two Arabic males in a Cadillac videotaping by the Ambassador Bridge."  He also stated that Plaintiffs were both from Dearborn and that the vehicle was registered to someone else who did not live on the same street.  He explained to his supervisor that it "just seems kind of odd."  He then told his supervisor that Plaintiff Shahit first stated that the car belonged to Plaintiff Elmathil, but then stated later that the car belonged to Plaintiff Elmathil's friend.

Near the end of the discussion with his supervisor, Defendant Tosqui can be heard asking if he should call for "another car to convey them."  Defendant Tosqui then stated "just for the videotaping, yeah, and they also have tinted window too, and he doesn't have a doctor's note." After ending the phone call, Defendant Tosqui stated to Defendant Parish, "take them in."

After Defendant Tosqui requested a transport vehicle, he asked Plaintiff Shahit to step out of the car.  Defendant Parish also motioned for Plaintiff Elmathil to step out of car.  Before Plaintiff Shahit stepped out of the car, however, Defendant Tosqui retrieved a retractable baton from what appears to be the space between the driver's door and the driver's seat.  All four individuals walked to the back of the Cadillac and Defendants began patting down both Plaintiffs. Defendant Tosqui asked Plaintiff Shahit why he had a baton, and Plaintiff Shahit responded that it was not his.

6

Defendants then handcuffed Plaintiffs and explained they were being detained, but not arrested. Plaintiff Elmathil then admitted that the baton belonged to him.

Plaintiff Shahit expressed surprise at being handcuffed.  Defendant Tosqui responded by reassuring Plaintiff Shahit that he was not being arrested.  When Plaintiff Shahit asked about the legality of the baton, Defendant Tosqui stated that "it's a weapon" and that he would "see about [it] because it might be a concealed weapon."  As Plaintiff Shahit continued to insist that he was a law-abiding citizen, Defendant Tosqui told him that he could raise his objections with the police supervisor at the station.  Defendant Tosqui also told Plaintiffs that the car would be impounded.

Plaintiff Elmathil then began to object to the car being impounded.  He requested to drive the car to the station, but when that request was denied, he asked if one of the Defendants could drive it so that it would not be towed.  When Defendant Tosqui denied that request, Plaintiff Elmathil asked if he could simply call the owner and have him come get the car.  Defendant Tosqui denied that request also.

The transport vehicle arrived and Defendant Tosqui explained to the arriving officers that Plaintiffs were only being detained, but that they "might be under arrest" for carrying a concealed weapon.  Before leaving with the Plaintiffs, one of the arriving officers asked Defendant Tosqui for the basis of the arrest, and he replied that he would tell the officer later.  When the officer persisted, Defendant Tosqui explained that "they're from Dearborn, they're driving somebody else's car, they're videotaping, they came off from the bridge right here, and upon talking them out, I [found] a weapon."  The officer then asked about the alleged weapon and Defendant Tosqui explained that it was an "asp."  The officer had apparently never heard of an "asp," and Defendant Tosqui further explained that it was an "extendable baton."   The arriving officers then transported Plaintiffs to the

police station, where Plaintiffs were held amidst news reports that terrorist suspects had been

detained.  Plaintiffs were released two days later without any charges being filed.[4]

## C.    Procedural History

Plaintiffs Shahit and Elmathil filed their Complaint in Wayne County Circuit Court on March

22, 2004.  Plaintiffs' six-count Complaint alleged the following:

| | |
|---|---|
| Count I | False Arrest; |
| Count II | False Imprisonment; |
| Count III | Defamation of Character; |
| Count IV | Ethnic Intimidation; |
| Count V | Violation of 42 U.S.C. § 1983; and |
| Count VI | Conspiracy to Violate Civil Rights. |

*See* March 22, 2004, Complaint.  On April 23, 2004, Defendants removed the action to this Court

pursuant to 28 U.S.C. § 1441.  Plaintiffs filed a motion to remand on May 14, 2004, arguing that 28

U.S.C. § 1441(c) supported remanding the matter because of the predominance of state-law claims.

In the alternative, Plaintiffs maintained that the state-law claims should be remanded pursuant to 28

U.S.C. § 1367(c).  The Court granted Plaintiffs' alternative request on July 20, 2004, and remanded

the supplemental state law claims. Presently before the Court is Defendants' motion for summary

judgment.

## III.  LEGAL STANDARD

Summary judgment is appropriate only if the answers to interrogatories, depositions,

---

[4] Defendants did receive a traffic citation for having tinted windows with excessive solar reflectance.  This citation was dismissed by a district judge, however, presumably because the receipt for the window tint indicates a solar reflectance of only 7%, which is well below the prohibited level.

admissions, and pleadings combined with the affidavits in support show that no genuine issue as to any material fact remains and the moving party is entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c). A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted). In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324. The non-moving party must do more than show that there is some abstract doubt as to the material facts. It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *See Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

## IV. ANALYSIS

Defendants argue that summary judgment is appropriate. Defendants argue that they

properly stopped Plaintiffs based upon their belief that the Cadillac's windows were excessively reflective and Plaintiff Elmathil's allegedly suspicious use of the camcorder near the Ambassador Bridge during a period of heightened security. Defendants further argue that they had probable cause to arrest Plaintiffs based on the collapsible baton and Plaintiff Shahit's inconsistent answers about who owned the vehicle. With respect to Plaintiffs' equal protection claim, Defendants deny that Plaintiffs were deprived of any rights or otherwise injured because of their race. Finally, Defendants argue that they are entitled to qualified immunity because all of their actions were reasonable.

Plaintiffs argue that summary judgment is not appropriate. Plaintiffs argue that Defendants violated the Fourth Amendment by stopping and arresting them without reasonable suspicion or probable cause. Plaintiffs argue that Defendants had no reasonable suspicion to stop the vehicle because (1) Plaintiff Elmathil had stopped using the camcorder before arriving at the intersection; thus, neither Defendant could have seen the camcorder until after the stop; (2) even if Plaintiff Elmathil was using the camcorder inside the car within a mile of the Ambassador Bridge, it is not a crime to do so, nor is it evidence of a crime; and (3) any suspicion that the tinted windows were illegal would be unreasonable given the overcast skies, time of day, and the low solar reflectance of the windows. Plaintiffs further argue that the arrest was not supported by probable cause because even if the tinted windows were illegal, Defendants could only issue a civil infraction and would have no authority to detain Plaintiffs or remove them from the Cadillac. Finally, Plaintiffs argue that the baton found in the car does not support probable cause to arrest because (1) Defendants had already made the decision to arrest Plaintiffs before Defendant Tosqui found the baton, and (2) the baton was legal to possess.

10

Plaintiffs also argue that summary judgment is not appropriate because Defendants decided to stop and arrest them because of their race in violation of the Equal Protection Clause of the Fourteenth Amendment.  Plaintiffs hypothesize that Defendants saw that they were likely of Arab descent at the intersection and decided to stop them solely on the basis of their ethnicity.  Thus, Plaintiffs argue that Defendants would not have stopped or arrested white or African-American citizens, for example, in the same or similar circumstances.  Plaintiffs further argue that Defendants conspired to deprive them of equal protection under the law.  The Court will first address Plaintiffs' Fourth Amendment and Equal Protection Clause claims, which Plaintiffs bring under 42 U.S.C. § 1983.  Thereafter, the Court will address Plaintiffs' conspiracy claim, which they bring under 42 U.S.C. § 1985.

**A.      Plaintiffs' Claims Under 42 U.S.C. § 1983**

Section 1983 reads, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  To prove a claim under § 1983, a plaintiff must establish that: 1) he was deprived of a constitutional right, and 2) he was deprived of that right by a person acting under the color of state law.  *See Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994).

Even if Plaintiffs establish the requisite elements under § 1983, they must also demonstrate that the defendants are not entitled to qualified immunity.  It is well-settled that government officials exercising discretionary functions are protected from personal liability so long as their actions do

11

not violate a "clearly established" federal statutory or constitutional right of which "a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The contours of that right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). Moreover, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In other words, "[t]he relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. This standard protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Additionally, qualified immunity is "*immunity from suit* rather than a mere defense to liability; and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

The Sixth Circuit has identified a three-prong test for evaluating a claim of qualified immunity:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence 'to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'

*Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)(quoting *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999)(*en banc*)). The parties' burdens with respect to qualified immunity have also been clearly delineated by the Sixth Circuit:

> The defendant bears the initial burden of coming forward with facts to suggest that he or she acted within the scope of his or her discretionary authority during the incident in question. The burden then shifts to the plaintiff to establish that the defendant's conduct violated a right so clearly established that any official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992). The ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity. *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

*Flint ex rel. Flint v. Kentucky Dept. of Corrections*, 270 F.3d 340, 347 (6th Cir. 2001). Finally, "[a]lthough the Fourth Amendment 'reasonableness' inquiry is largely fact-driven, summary judgment for defendant public servants founded upon qualified immunity is nonetheless appropriate when the undisputed facts, or the plaintiff's version of disputed material facts, demonstrate that a hypothetical reasonable officer would not have known that his actions, under the circumstances, were objectively unreasonable." *Scott v. Clay County, Tenn.*, 205 F.3d 867, 877 (6th Cir. 2000) (citation omitted).

### 1.      *Unreasonable Seizure Under the Fourth Amendment*

Plaintiffs allege that Defendants violated the Fourth Amendment's prohibition on unreasonable searches and seizures. *See* U.S. CONST. amend. IV. Under settled constitutional law, brief investigatory stops of an individual's vehicle must be supported by a reasonable suspicion that criminal activity may be afoot. *See United States v. Sandridge*, 385 F.3d 1032, 1036 (6th Cir. 2004). In addition, it is equally settled that an arrest without probable cause violates the Fourth Amendment. *See Crockett v. Cumberland College*, 316 F.3d 571, 580 (6th Cir. 2003).

To determine whether police officers had reasonable suspicion to stop an individual, courts must review the "totality of the circumstances" to determine whether the detaining officers had a

"particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417-18, (1981); *see also Terry v. Ohio,* 392 U.S. 1, 21-22, (1968) (explaining that an officer's actions are "judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?") (citation omitted).  In other words, the detaining officers "must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity."  *Illinois v. Wardlow,* 528 U.S. 119, 123-24 (2000) (quotations omitted).  The likelihood of criminal activity "need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard[.]" *United States v. Arvizu,* 534 U.S. 266, 274 (2002) (citation omitted).  In addition, it is inappropriate to examine each individual circumstance in isolation; rather, they must be considered in their totality.  *See United States v. Orsolini,* 300 F.3d 724, 728 (6th Cir. 2002).  Moreover, the officers "need not rule out the possibility of innocent conduct" to have reasonable suspicion. *Arvizu*, 534 U.S. at 277.

Probable cause, on the other hand, is a "fair probability" that the individual to be arrested has either committed or intends to commit a crime. *Northrop v. Trippett*, 265 F.3d 372, 379 (6th Cir. 2001).  Probable cause exists if the facts and circumstances within the officer's knowledge are sufficient to inform "a prudent person, or one of reasonable caution," that the suspect "has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).  In other words, probable cause is "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990).  In addition, "[t]he probability of criminal activity is assessed under a reasonableness

14

standard based on 'an examination of all facts and circumstances *within an officer's knowledge at the time of an arrest*.'"  *Crockett*, 316 F.3d at 580 (quoting *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999)).   Finally, the existence of probable cause is a question for the jury, unless there is only one reasonable determination possible.  *See Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002).

### a.      The Initial Stop

Defendants maintain that they properly stopped Plaintiffs based upon a reasonable suspicion that (1) Plaintiffs were "casing" the Ambassador Bridge in furtherance of possible terrorist activities, and (2) the tint on the Cadillac's rear windows caused excessive solar reflectance.  Plaintiffs argue that Defendants could not have reasonably suspected that Plaintiffs were "casing" anything because Plaintiff Elmathil had stopped using the camcorder and at no point did Plaintiffs drive on the Ambassador Bridge.  Plaintiffs further argue that Defendants could not have suspected that the windows had excessive solar reflectance because the skies were overcast and it was late in the day. Despite the overcast skies, however, each Defendant claims that he "could not see through the [Cadillac's] windows at all, so the only thing that made them visible was the reflection of the sunlight off their surfaces."  Tosqui Aff. at ¶ 3; Parish Aff. at ¶ 3.

It is well-settled that a police officer may stop a vehicle upon reasonable suspicion that occupants of the vehicle committed a felony or were in the process of committing a felony or a misdemeanor.  *See Gaddis v. Redford Twp.*, 364 F.3d 763, 771, n. 6 (6th Cir. 2004) (citations omitted).  A police officer must have probable cause, however, to stop a vehicle if its occupant was involved in a completed misdemeanor.  *See Gaddis*, 364 F.3d at 771, n.6.  In addition, a police officer must have probable cause to stop a vehicle for a civil traffic offense, such as operating a

vehicle with excessively reflective window tint.  *See Whren v. United States*, 517 U.S. 806, 810 (1996)(emphasis added) ("As a general matter, the decision to stop an automobile is reasonable where the police have *probable cause* to believe that a traffic violation has occurred."); *see also United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000) (invalidating a traffic stop where the police lacked probable cause to stop the defendant's vehicle for violating a traffic rule requiring motorists to operate their vehicles within a single lane); *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (*en banc*) ("[S]o long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful.").  Thus, to the extent that Defendants seek to justify stopping Plaintiffs based on the solar reflectance of the window tint, Defendants must have had probable cause at the time of the stop to believe that the windows were not in compliance with the statute.  To the extent Defendants seek to justify the stop based on suspicion of terrorist activities, Defendants must have had reasonable suspicion that Plaintiffs were engaging in criminal activities.

The Court finds that Defendants are entitled to qualified immunity with respect to the initial stop.  First, no reasonable jury could believe Plaintiff Elmathil's statement that he placed the camcorder either on the floor or on the back seat before the Cadillac approached the intersection.  As the squad-car video tape reveals, after Plaintiff Shahit admits that Plaintiff Elmathil was filming, Defendant Tosqui states "That's why I pulled you over."  Notably, Plaintiff Shahit did not indicate when Plaintiff Elmathil was filming.  Thus, had Defendants not seen Plaintiff Elmathil operating the camcorder, as Plaintiffs allege, Defendant Tosqui would have had no basis for stating that the reason for the stop was Plaintiff Elmathil's videotaping.  It stretches the imagination to believe that Defendant Tosqui would have mentioned the videotaping as a basis for the stop had he not seen

16

Plaintiff Elmathil using the camcorder because he would have no way of knowing when Plaintiff Elmathil had stopped filming.  If all that Defendant Tosqui knew was that Plaintiff Elmathil had been filming at some point during a drive of undetermined length, it is highly unlikely that Defendant Tosqui would have mentioned Plaintiff Elmathil's use of the camcorder when he could have just as easily asked about the tinted windows, which he did a few moments later.  Accordingly, in light of the verbal exchange between Defendant Tosqui and Plaintiff Shahit, the Court concludes that no reasonable jury would find that Plaintiff Elmathil lowered the camcorder before reaching the intersection.

Second, Defendants reasonably stopped Plaintiffs based on the window tint.  Defendants are entitled to qualified immunity so long as their actions did not violate a clearly established constitutional right of which a reasonable person would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The Supreme Court has never directly addressed the issue of whether probable cause or reasonable suspicion is required before stopping a motorist for a traffic violation.  In *Whren v. United States*, 517 U.S. 806 (1996), the Supreme Court stated that "[a]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."  *See Whren*, 517 U.S. at 810.  Although the Supreme Court stated that a stop based on probable cause is reasonable, it does not necessarily follow that a stop based on reasonable suspicion would be unreasonable.  *See Gaddis v. Redford Twp.*, 364 F.3d 763, 769, n. 4 (6th Cir. 2004) ("Indeed, *Whren* did not even hold that all stops premised on a civil traffic violation require probable cause--only that if police *do* have probable cause, then any claim of pretext is irrelevant for Fourth Amendment purposes.").  Thus, the Supreme Court has not spoken definitively on the issue of the standard to be applied to stops for civil traffic violations.

17

At the time of the stop in this case, the Sixth Circuit had also not addressed whether police officers must have probable cause to stop a motorist for a civil traffic offense. Although in one decision, *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000), the Sixth Circuit invalidated a traffic stop based on a lack of probable cause to believe that a traffic offense occurred, the court did not specifically address the issue of whether probable cause is always required in order to stop a motorist suspected of committing a civil traffic violation. Indeed, only a few years later, in *Weaver v. Shadoan*, 340 F.3d 398 (6th Cir. 2003), the Sixth Circuit upheld a traffic stop based on the officer's *reasonable suspicion* that the driver's registration was expired and obscured by excessive window tinting. *See Weaver*, 340 F.3d at 407-408. Although the Sixth Circuit in *Gaddis* stated that the earlier *Freeman* decision "appears" to control the issue of whether probable cause or reasonable suspicion is required to support a traffic stop, s*ee Gaddis*, 364 F.3d at 771, n.6, *Gaddis* was not decided until after the events occurred in this case. The Court finds it impossible to conclude that Defendants, police officers who are required to make split-second decisions on the street, violated a "clearly established" right to be stopped only upon probable cause that a civil traffic violation occurred when only a few months later, in *Weaver*, a trio of federal appellate judges clearly believed that probable cause was not required. Accordingly, given that the Supreme Court and the Sixth Circuit had not directly addressed the issue of whether probable cause is always required to stop a vehicle for a civil traffic offense, and Sixth Circuit in *Weaver* upheld a traffic stop based upon reasonable suspicion shortly after the events of this case occurred, the Court finds that the right to be stopped only upon probable cause that a civil traffic offense occurred was not clearly established when Defendants stopped Plaintiffs' vehicle.

Of course, if Defendants did not even have reasonable suspicion to believe that the windows

were illegal, Defendants would not be entitled to qualified immunity.  The Court, however, finds that Defendants have established that they had reasonable suspicion.  As noted above, Plaintiffs allege that the Cadillac's windows had a solar reflectance of 7 percent.  Plaintiffs also make much of the fact that 7 percent is much lower than the 35 percent prohibited by statute.  Defendants, however, need not make a precise assessment in order to stop the vehicle; they need only "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417-18, (1981).  Furthermore, although Plaintiffs argue that the overcast weather conditions limited Defendants' ability to see any reflection off the Cadillac's windows, the squad-car videotape reveals that the conditions were ripe for causing the windows to appear reflective.  For instance, the rain caused the road to be highly reflective as evidenced by the reflection of the Cadillac's brake lights in the road.  Thus, Plaintiffs contention that Defendants' testimony should be discounted because of the weather conditions is unpersuasive.  Therefore, the Court finds that Defendants' affidavits, Plaintiffs' admission that the Cadillac's tinted windows are reflective though technically legal, and the squad-car videotape, all demonstrate that Defendants have articulated "more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Illinois v. Wardlow,* 528 U.S. 119, 123-24 (2000).  Accordingly, the Court finds that Defendants reasonably suspected that the Cadillac's windows were excessively reflective and, therefore, Defendants are entitled to qualified immunity with respect to the initial stop.

### b.    The Arrest

Defendants also argue that no Fourth Amendment violation occurred when they arrested Plaintiffs.  Defendants claim that they had probable cause to arrest Plaintiffs for stealing the

Cadillac, or taking it without authorization, because the car was registered to someone else and

Plaintiff Shahit gave inconsistent statements about who owned the car.[5]  Defendants also claim that

they had probable cause to arrest Plaintiffs for possession of a dangerous weapon in a vehicle in

violation of MICH. COMP. LAWS § 750.227, and possession of a "billy" or "bludgeon" in violation

of MICH. COMP. LAWS § 750.224(d), based on the seizure of the extendable baton.[6]

Plaintiffs respond by arguing that Defendants did not have probable cause to arrest for

carrying a dangerous weapon or stealing the car.  With respect to Defendants' suspicions of auto

theft, Plaintiffs maintain that the Cadillac was not reported stolen, nor did either Defendant mention

non-ownership of the vehicle as a basis for the arrest in their depositions.  With respect to the baton,

Plaintiffs argue that the baton could not provide an adequate basis for the arrest because Defendants

made the decision to arrest Plaintiffs before Defendant Tosqui found the baton.  Plaintiffs also argue

that Defendants escalated the initial stop into a *de facto* custodial arrest by ordering Plaintiffs out

of the car before Defendant Tosqui found the baton.  Plaintiffs argue in the alternative that even if

they were not arrested until after Defendant Tosqui found the baton, the Michigan Court of Appeals

has held that such batons do not constitute either "billies" or a "bludgeons."  *See People v. Lovett*,

---

[5] *See* MICH. COMP. LAWS § 750.413 (prohibiting the taking possession of and driving away a motor vehicle without authority); MICH. COMP. LAWS § 750.414 (prohibiting the unauthorized taking or use of a motor vehicle with intent to steal); and MICH. COMP. LAWS § 750.535(7) (prohibiting the possession of a stolen motor vehicle).

[6] It is important to note that Defendants do not argue that the combination of Plaintiffs' ethnicity, the use of the video camera near the Ambassador Bridge, and non-ownership of the car created probable cause to arrest for terrorism-related activities.  Instead, Defendants rely only on the seizure of the baton as probable cause to arrest for carrying a concealed weapon and non-ownership of the vehicle as probable cause to arrest for a theft crime.  In other words, Defendants do not assert that suspicion of terrorism justified the arrest.  Thus, this case does not present issues of probable cause in the context of potential terrorist activities.

No. 212213, 1999 WL 33444337 (Mich. Ct. App. May 18, 1999).

As set forth below, the Court finds that (1) Plaintiffs were not under a *de facto* arrest before Defendant Tosqui found the baton in plain sight, and (2) the baton provided probable cause to arrest Plaintiffs for carrying a billy or a bludgeon. The Court also finds that even if Defendants lacked probable cause to suspect Plaintiffs of carrying a "billy" or a "bludgeon," Defendants are nevertheless entitled to qualified immunity. Accordingly, the Court need not discuss whether Plaintiffs' behavior provided probable cause to arrest for suspicion of vehicle theft.

> i.       *Whether Plaintiffs Were Under a De Facto Arrest Before Defendant Tosqui Found the Baton*

Plaintiffs argue that because Defendants decided to arrest them before finding the baton, the baton cannot provide a legitimate basis for the arrest. A police officer, however, must have probable cause to make a warrantless arrest "at the moment the arrest was made." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). Determining whether the officer had probable cause at the moment of arrest requires analyzing the objective facts available to the officer at the time, not his subjective intentions or thoughts. *See Whren*, 517 U.S. at 813 (holding that "[s]ubjective intentions play no role in ordinary, probable cause Fourth Amendment analysis."); *United States v. Rose*, 889 F.2d 1490, 1493 (6th Cir. 1989) ("The subjective intent of the officers is relevant to an assessment of the fourth amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted."); *United States v. Oates*, 560 F.2d 45, 58 (2d Cir. 1977) (holding that police officer's subjective belief that suspect was under arrest did not turn an otherwise investigatory stop into an arrest). Accordingly, Plaintiffs' assertion that the arrest was invalid because Defendant Tosqui may have subjectively *decided* to arrest Plaintiffs before finding the baton is without merit.

21

The issue of whether the stop ripened into a custodial arrest when Defendants asked Plaintiffs to step out of the car, however, is more difficult.  "'Although an officer may have reasonable suspicion to detain a person or his possessions for investigation, the officer's investigative detention can mature into an arrest or seizure if it occurs over an unreasonable period of time or under unreasonable circumstances.'" *United States v. Heath,* 259 F.3d 522, 529-30 (6th Cir.2001) (quoting *United States v. Avery*, 137 F.3d 343, 349 (6th Cir.1997)).  *See also Weaver v. Shadoan,* 340 F.3d 398, 408 (6th Cir.2003) ("An investigative *Terry* stop may ripen into a *de facto* arrest through the passage of time or the use of force.").  The Sixth Circuit Court of Appeals has recently discussed the question of when an investigatory stop supported by reasonable suspicion becomes an arrest which must be supported by probable cause:

> In determining whether a confrontation that began as a *Terry* stop has matured into an arrest, we assess 'whether the use of force was reasonably related in scope to the situation at hand,' *Feathers,* 319 F.3d at 851, or, likewise, whether 'the length and manner of [the] investigative stop [was] reasonably related to the basis for the initial intrusion, *Weaver,* 340 F.3d at 408.  '[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.' *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

*Fisher v. Harden*, 398 F.3d 837, 844 (6th Cir. 2005).  Thus, "[t]o detain the motorist any longer than is reasonably necessary to issue the traffic citation . . . the officer must have reasonable suspicion that the individual is engaged in more extensive criminal conduct."  *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002).

As discussed above, Defendants maintain that they stopped Plaintiffs because they suspected that (1) Plaintiffs were possibly engaging in terrorism-related reconnaissance, and (2) the Cadillac's

rear windows exhibited excessive solar reflectancy.  After Defendant Tosqui approached Plaintiff

Shahit and asked for his license, registration, and insurance, however, Plaintiff Shahit immediately

volunteered that the vehicle was not his and that it belonged to Plaintiff Elmathil.  The vehicle,

however, did not belong to Plaintiff Elmathil, and the squad car videotape does not reveal, nor does

either Plaintiff allege, that Plaintiff Elmathil corrected Plaintiff Shahit's erroneous statement.

Plaintiff Shahit changed his story and stated that Plaintiff Elmathil's friend was actually the owner

only after Defendant Tosqui pointed out that the registration did not list either Plaintiff as the owner.

In addition, Plaintiffs have not disputed Defendant Parish's assertion that Plaintiff Elmathil appeared

nervous during the stop.

On these facts, the Court finds that Defendants had reasonable suspicion to believe that the

Cadillac was possibly stolen.  *See e.g., United States v. Kalu*, 1992 WL 42324, * 1-2 (6th Cir. 1992)

(holding that officer had reasonable suspicion to investigate theft or unauthorized use of a rental car

where neither driver nor passenger were listed on the rental agreement and the passenger appeared

nervous, but both had valid driver's licenses, no criminal history, and the car was not reported

stolen).  Defendants have pointed to specific facts that could lead a reasonable person to at least

suspect that criminal activity was afoot.  Therefore, the issue is whether Defendant Tosqui's request

for Plaintiff Shahit to step out of the car and his opening of Plaintiff Shahit's door, which were the

only police actions before Defendant Tosqui found the baton, were reasonably related to Defendant

Tosqui's suspicions of car theft.  If Defendant Tosqui's actions were unreasonable in light of his

suspicions of auto theft, and he escalated the stop into a custodial arrest, the baton could not have

provided probable cause to arrest.  On the other hand, if Defendant Tosqui's actions were reasonable

in light of his suspicions, the baton may have provided probable cause.

The Court finds that by simply telling Plaintiff Shahit to exit the car and opening his door, Defendant Tosqui did not escalate the *Terry* stop into a custodial arrest.  Plaintiffs provide no case in which words alone, particularly words that did not remotely convey that the suspect was under arrest, were found to escalate a *Terry* stop into a *de facto* arrest.  *C.f. Gardenhire v. Schubert*, 205 F.3d 303, 314 (6th Cir. 2000) (holding that a jury could reasonably find that plaintiffs were under arrest where officers told plaintiffs, among other things, to drive to the police station where they would be "booked" and have to post bond to be released).  Moreover, it was not unreasonable for Defendant Tosqui to remove Plaintiffs from a car that he suspected might be stolen.

In *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), the Supreme Court described a police officer's order to exit the vehicle as a "*de minimus*" intrusion into the personal liberty of the driver in light of the officer's "legitimate and weighty" safety concerns.  *Mimms*, 434 U.S. at 110-111.  In *Mimms*, it was the officer's "practice to order all drivers out of their vehicles as a matter of course whenever they had been stopped for a traffic violation . . . as a precautionary measure[.]" *Id*. at 110.  Defendants initially questioned Plaintiffs without removing them from the car; thus, Defendants were apparently not as concerned about the danger inherent in routine traffic stops.  Nevertheless, unlike the officer in *Mimms*, Defendants reasonably suspected that the Cadillac was stolen.  Thus, just as it was not unreasonable for the officer in *Mimms* to impose a *de minimus* intrusion out of concern for his safety, it was also not unreasonable for Defendants to impose that same *de minimus* intrusion in order to further investigate his suspicion of theft, to separate potential car thieves from the very car they were suspected of stealing, and to avoid a potentially lengthy investigation on the side of the road.

The Court recognizes that Defendant Tosqui had already ordered a transport vehicle and

24

might have transported Plaintiffs to the police station regardless of whether he spotted the baton, and that such a transport may have raised Fourth Amendment concerns. *See Hayes v. Florida*, 470 U.S. 811, 815-16 (1985) ("[O]ur view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes."). Nevertheless, no such transportation took place before Defendant Tosqui found the baton. Had Defendant Tosqui not found the baton, Defendants may not have handcuffed Plaintiffs, or Defendants may have asked Plaintiffs for their consent to ride with the arriving officers to the police station to wait "until reasonable suspicion is cleared up." *See Kalu*, 1992 WL 42324, at 3; ("In light of the continuing safety risks attendant with waiting on the highway, not only to the officer and the detainees but as to passing traffic impeded by 'gawkers,' we do not think it was unreasonable to have the defendant accompany the officer a few miles up the highway and wait in the lobby while [the officer] personally and immediately investigated the matter."). The point is that speculation about what may have occurred had Defendant Tosqui not found the baton does not support a finding that the relatively minor actions of Defendant Tosqui before he found the baton escalated the stop to a situation requiring probable cause. Accordingly, the Court finds that regardless of Defendant Tosqui's subjective intentions, telling Plaintiff Shahit to exit the car and opening his door did not escalate the stop into a custodial arrest.

Having determined that Plaintiffs were not under arrest when Defendant Tosqui found the baton, the issue becomes whether Defendants had probable cause to arrest Plaintiffs for carrying the baton.

        ii.        *Whether Seizure of the Baton Provided Probable Cause to Arrest*

Under Michigan law it is a felony to possess a "billy" or "bludgeon." *See* MICH. COMP. LAWS § 750.224(d). The term "bludgeon" is not defined by the statute, but according to the Michigan Court of Appeals, it is a "short club" or a "short stick" that is "usually weighted at one end or bigger at one end than the other, and designed for use as a weapon." *People v. Beasley*, 497 N.W.2d 200, 201 (Mich. Ct. App. 1993) (citing CJI2d 11.29 and *Webster's New Collegiate Dictionary* (1974)). The term "billy" is also not defined by the statute, but a Michigan Jury Instruction describes it as "a small bludgeon that may be carried in the pocket." *People v. Lovett*, 1999 WL 33444337, * 2 (Mich. Ct. App. May 18, 1999) (quoting CJI2d 11.29(1)(F)). The Michigan Court of Appeals has also held that a billy is usually fairly short, less than 24 inches in length. *See People v. Hassenfratz*, 297 N.W.2d 641, 642 (Mich. Ct. App. 1980). In addition to prohibiting "billies" and "bludgeons," Michigan law also prohibits the carrying of any "dangerous weapon":

> Sec. 227. (1) A person shall not carry a dagger, dirk, stiletto, a double-edged nonfolding stabbing instrument of any length, *or any other dangerous weapon*, except a hunting knife adapted and carried as such, concealed on or about his or her person, or whether concealed or otherwise in any vehicle operated or occupied by the person, except in his or her dwelling house, place of business or on other land possessed by the person.

MICH. COMP. LAWS § 750.227 (emphasis added).

Defendants argue that the baton meets the definition of both a "billy" and a "bludgeon." Defendants also argue that the baton is a dangerous weapon within Section 750.227. Plaintiffs respond by arguing that the extendable baton is not a "bludgeon" because it does not have a thicker, weighted end, and it is not a "billy" because it does not have a weighted end and it is too long. Plaintiffs do not respond to Defendants' contention that the baton is a dangerous weapon under Section 750.227.

26

Although Plaintiffs failed to respond to Defendants' argument that the baton is a dangerous weapon, the Court finds that a reasonable person would not have suspected that Plaintiffs were in possession of a dangerous weapon because MICH. COMP. LAWS § 750.227 only prohibits dangerous *stabbing* weapons, such as knives. *See People v. Smith*, 225 N.W.2d 165, 166-67 (Mich. 1975). Nevertheless, the Court finds that a reasonable person would have been justified in suspecting that Plaintiffs were in possession of a "billy" or a "bludgeon." Although Plaintiff assumes that "bludgeons" and "billies" must have a thicker end *opposite the handle*, the Court finds no published Michigan decision supporting this assumption.

For instance, in *Beasley*, the Michigan Court of Appeals determined that a nightstick that was of uniform thickness from one end to the other was not a "bludgeon" because it "did not possess the distinguishing characteristic of having a weighted or thicker end." *Beasley*, 497 N.W.2d at 201. The *Beasley* court did not determine, nor do any dictionary definitions state, however, that a "bludgeon" must be thicker or weighted at the end opposite the handle.[7] *See People v. Malik*, 245 N.W.2d 434, 436 (Mich. Ct. App. 1976) (citing three different dictionary definitions, each of which defines a bludgeon as a stick or club that is thicker or heavier at "one end."). Indeed, at least one court has held that a weapon with a thicker handle end constitutes a "bludgeon." *See People v. Collins*, 286 N.E.2d 117, 119 (Ill. Ct. App. 1972) (emphasis added) ("[I]t is clear that the instrument found in an automobile under the defendant's control was a chain approximately three fee in length which had been wrapped with tape, one end being thicker than the other since it had been looped, *thus*

---

[7] Although the Michigan Court of Appeals in *Lovett* indicated that bludgeons and billies have a thicker "business" end, which presumably means the end opposite the handle, *Lovett* is an unpublished decision with no precedential value. *See Lovett*, 1999 WL 33444337 at * 2. Thus, the Court finds Plaintiffs' reliance on *Lovett* to be unpersuasive.

27

*providing a type of handle*.").  Accordingly, the Court finds that Defendants had probable cause to arrest Plaintiffs for possession of a "bludgeon."

Additionally, the Court finds that even if the baton does not fit within the definition of a "bludgeon," it does fit within the definition of a "billy."  In *Beasley*, the Michigan Court of Appeals relied on *Webster's New Collegiate Dictionary* for the definition of a "bludgeon."  *See Beasley*, 497 N.W.2d at 201.  *Webster's Ninth New Collegiate Dictionary* defines a "billy club" as "a heavy usually wooden club; *specif*: a policeman's club."  *Webster's Ninth New Collegiate Dictionary*, 150 (1983); *see also The American Heritage Dictionary of the English Language*, 181 (4th ed. 2000) (defining "billy club" as a "short stick or club, especially a police officer's club" and providing a picture of a police officer holding a club of uniform thickness).  In addition, the *Random House College Dictionary* defines a "billy" as "a policeman's club *or baton*." *Random House College Dictionary*, 134 (Rev. ed. 1982) (emphasis added).  None of these definitions require a billy to be thicker or weighted at a particular end, nor do any of the published Michigan decisions impose such requirement.[8]  Accordingly, the Court finds that Defendants had probable cause to arrest Plaintiffs once Defendant Tosqui seized the extendable baton, which a reasonable person could have suspected was either a "billy" or a "bludgeon."

### c.      Qualified Immunity With Respect to the Arrest

---

[8] The court in *People v. Hassenfratz*, 297 N.W.2d 641, 642 (Mich. Ct. App. 1980), noted that Black's Law Dictionary defines a "billy" as a small bludgeon.  The court, however, distinguished between the nightstick seized in that case and a "billy" based on the length of the nightstick, not its lack of a weighted or thicker end.  *See Hassenfratz*, 297 N.W.2d at 642.  The extendable baton seized by Defendant Tosqui is less than 12 inches when collapsed and less than 22 inches when extended; thus, even when it is extended it is shorter than the 24 inch nightstick seized in *Hassenfratz*.

Even if Defendants did not have probable cause to suspect that Plaintiffs possessed a "billy" or "bludgeon," Defendants are clearly entitled to qualified immunity.  As the Court noted above, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Plaintiffs argue that "the right to be free from arrests without probable cause has been clearly established for a long time."  Plaintiffs' Response Brief, at 15.  Plaintiffs, however, ignore the principle that qualified immunity "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).   Under Plaintiff's theory, no police officer would ever be entitled qualified immunity for arresting an individual without probable cause, no matter what the factual circumstances.  In this case, it was not unreasonable for Defendants to arrest Plaintiffs based on their possession of the baton.  The Michigan statutes do not define "billy" or "bludgeon," and as the Court discussed above, the extendable baton fits comfortably within the dictionary definitions of either term.  *See e.g., People v. Mercer*, 49 Cal. Rptr. 2d 728, 731 (Cal. App. 1995) (holding that a collapsible baton was a "billy").  Moreover, even if a court could find, for one reason or another, that the extendable baton does not fit precisely within either definition, qualified immunity provides "ample room for mistaken judgments . . . ."  *Malley*, 475 U.S. at 343.  Accordingly, the Court finds that Defendants did not act unreasonably and are entitled to qualified immunity with respect to Plaintiffs' wrongful arrest claim.

2.      *Racial Profiling in Violation of the Fourteenth Amendment*

Plaintiffs also allege that Defendants targeted them on the basis of their race and ethnicity in violation of the Equal Protection Clause of the Fourteenth Amendment.  *See* U.S. Const. amend. XIV, §1 ("[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the

laws."). "The Equal Protection Clause of the Fourteenth Amendment provides citizens with a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures." *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997). Thus, "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." *Whren v. United States*, 517 U.S. 806, 813 (1996). To prevail on their Equal Protection Claim, Plaintiffs must demonstrate through "direct, circumstantial, or statistical evidence," *United States v. Saucedo*, 226 F.3d 782, 790 (6th Cir. 2000), that Defendants subjected them "to unequal treatment based upon their race or ethnicity . . . ." *Farm Labor Organizing Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533 (6th Cir. 2002).

In the Sixth Circuit, selective enforcement claims are governed by the same analysis as selective prosecution claims. *See Farm Labor Organizing Comm.*, 308 F.3d at 534-35. "The Supreme Court has explained that a claimant alleging selective enforcement of facially neutral criminal laws must demonstrate that the challenged law enforcement practice 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Id.* (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). To establish a discriminatory effect, "the claimant must show that similarly situated individuals of a different race were not prosecuted." *Id.* (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)). If, however, the claimant presents evidence that the officers employed an explicit racial criteria or admit to racially motivated decision making, the claimant is not required to demonstrate the existence of a similarly situated class that was not prosecuted or investigated. *See id.*, 308 F.3d at n. 4. To establish a discriminatory purpose, the claimant must show that the officers' actions were based, at least in part, on some "unjustifiable standard, such as race, religion, or other arbitrary classification." *Wayte*, 470 U.S. at 608; *Farm*

*Labor Organizing Comm.*, 308 F.3d at 539 (holding that plaintiffs alleging selective enforcement need only show that law enforcement officers were "partly motivated by a discriminatory purpose."). The claimant's burden to demonstrate discriminatory purpose and effect "is a demanding one" given the "strong presumption that the state actors have properly discharged their official duties . . . ." *Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000) (quoting *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997)).  If the claimant satisfies his or her burden to show both discriminatory effect and discriminatory purpose, the burden shifts to the defendants to demonstrate that the same enforcement decision would have been made even if the improper purpose or classification had not been considered.  *See Farm Labor Organizing Comm.*, 308 F.3d at 539 (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).

Despite repeated references in the Complaint to racial discrimination, and Plaintiffs' express reliance on the Fourteenth Amendment in Count V of the Complaint, Defendants discuss only the Fourth Amendment in their opening brief.  Defendants assert in a footnote that at "a minimum, it is obvious that the facts fail to establish the violation of any clearly established right protected by the First, Fifth, or Fourteenth Amendment, so that qualified immunity shields Tosqui and Parish for any claim arising under those provisions."  Defendants' Brief in Support of Motion for Summary Judgment, at n. 16.  Plaintiffs respond by arguing that a reasonable jury could find that Defendants targeted them on the basis of their race and ethnicity.  Specifically, Plaintiffs claim that Defendant Tosqui's repeated reference to Plaintiffs as "Arabic men from Dearborn," Defendant Tosqui's false claim to his supervisor that Plaintiffs had just "come off the bridge," and Defendant Tosqui's admission during his deposition that Plaintiffs' ethnicity was a factor in his decision making support a finding of discriminatory purpose and effect.  Defendants reply by arguing that although they were

31

aware of Plaintiffs' ethnicity, there is no evidence that their "treatment of plaintiffs was anything less than courteous, nor that they made any racially derogatory comment or even harbored any negative feelings about persons of Arabic decent." Defendants' Reply Brief, at 4. Therefore, Defendants argue, Plaintiffs have failed to identify any "racial or ethnic animus[,]" which is required in order to state a claim under the Equal Protection Clause. *Id.*

As an initial matter, the Court finds unpersuasive Defendants' contention that Plaintiffs must prove racial hostility in order to establish discriminatory animus. So long as Defendant Tosqui's actions were taken "by reason of" Plaintiffs' ethnicity, those actions were taken with the necessary discriminatory animus. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993). Nevertheless, the Court finds that Defendants are entitled to summary judgement because Plaintiffs have not established a discriminatory effect.

A discriminatory effect in a selective enforcement case is shown "by naming a similarly situated individual who was not investigated or through statistical or other evidence which 'address[es] the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated.'" *Farm Labor*, 308 at 534 (quoting *Chavez v. Ill. State Polic*, 251 F.3d 612, 638 (7th Cir. 2001)). Thus, Plaintiffs must present credible evidence tending to show that individuals who were not of Arab descent engaged in the same conduct but were not stopped or arrested. *See United States v. Armstrong*, 517 U.S. 456, 470 (1996) (holding that the respondents' statistical study did not demonstrate a discriminatory effect because it "failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted."). In *Farm Labor*, the defendant officers all admitted that "they would refer Hispanic motorists to the Border Patrol when, in precisely the same

32

circumstances, they would not refer someone who was white (i.e., not of Hispanic appearance)." *Farm Labor*, 308 F.3d at 536 (quoting the district court). There was also evidence that the defendant officers were poorly trained with respect to detecting immigration violations, and most of the motorists who were asked about their green cards were Hispanic-looking. *See id.*

Plaintiffs in the present case have not identified evidence of non-Arab individuals who could have been stopped and arrested in similar circumstances but were not. The only evidence even remotely probative is Defendant Tosqui's deposition testimony where he admits that Plaintiffs' ethnicity was "significant" in light of the other facts, such as Plaintiffs' non-ownership of the Cadillac, Plaintiff Shahit's inconsistent statements about who owned the car, the close proximity to the Ambassador Bridge, and the information that Defendant Tosqui received from the federal government indicating that people of Arab descent were responsible for the terrorist attacks in September, 2001. *See* Tosqui Dep. at 22-24. Defendant Tosqui's subjective belief that the Plaintiffs' ethnicity was significant does not necessarily show that he would not have stopped and arrested individuals of a different ethnicity in similar circumstances.

Defendant Tosqui maintained that he would have stopped anyone for the videotaping and window tint violation. *See* Tosqui Dep. at 22. In addition, he was never asked whether he would have arrested individuals of a different race in the same circumstances. Plaintiffs' counsel asked Defendant Tosqui if he would have stopped two Irish or Italian individuals in the same circumstances, and Defendant Tosqui answered that he would have based on the "filming and [the fact that] the vehicle had tinted windows." Tosqui Dep. at 23. Plaintiffs' counsel then asked Defendant Tosqui whether they "would . . . have been arrested." *Id.* Defendant Tosqui stated that he could not answer that question because "[t]here's more circumstances to it than *just those two*

33

*things*." *Id.* (emphasis added).  It is apparent based on this exchange that Defendant Tosqui thought

that Plaintiffs' counsel was asking him whether he would have arrested two non-Arabic individuals

for the window tint and videotaping only.  Therefore, Defendant Tosqui's deposition testimony is

substantially less probative on the issue of discriminatory effect than that in *Farm Labor* where all

of the defendants admitted they treated Hispanic individuals differently than non-Hispanic

individuals with respect to immigration investigations.  *See Farm Labor*, 308 F.3d at 536.

Accordingly, given the "demanding" burden on the Plaintiffs to present "clear evidence" that the

officer has violated equal protection, *Armstrong*, 517 U.S. at 465, the Court finds that Defendants

are entitled to summary judgment with respect to Plaintiffs' claim under the Equal Protection Clause

of the Fourteenth Amendment.[9]

**B.     Plaintiffs' Conspiracy Claim Under 42 U.S.C. § 1985**

        Plaintiffs also allege that Defendant Tosqui and Defendant Parrish conspired to deprive them

of their civil rights in violation of 42 U.S.C. § 1985.  Section 1985 provides, in pertinent part:

> (3) Depriving persons of rights or privileges
>
> If two or more persons in any State or Territory conspire . . . for the
> purpose of depriving, either directly or indirectly, any person or class
> of persons of the equal protection of the laws, or of equal privileges
> and immunities under the laws . . . the party so injured or deprived
> may have an action for the recovery of damages occasioned by such
> injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).  To establish a claim under § 1985, a plaintiff must show: "1) a conspiracy;

2) for [the] purpose of depriving, either directly or indirectly, any person or class of persons of the

---

[9] Defendant Parrish is also entitled to summary judgment because there is no evidence
that he considered Plaintiffs' ethnicity to be relevant in any way.

equal protection of the laws, or of equal privileges and immunities under the laws; 3) an act in furtherance of the conspiracy; and 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Riddle v. Egensperger*, 266 F.3d 542, 549 (6th Cir. 2001) (citation omitted). The plaintiff must also "establish that the conspiracy was motivated by class-based animus." *Johnson v. Hills & Dales General Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994).

Plaintiffs' conspiracy claim fails for two reasons. First, there is no record evidence to support the contention that Defendant Tosqui and Defendant Parish agreed to act in concert for the purpose of depriving Plaintiffs of their civil rights. *See Walker v. Michael W. Colton Trust*, 33 F. Supp. 2d 585, 595 (E.D. Mich. 1999) (noting that a conspiracy requires an agreement). Defendant Parish denied that Plaintiffs' ethnicity was relevant to any of the decisions that the officers made, and Plaintiffs have not shown that Defendant Parish, who treated Plaintiffs with the utmost respect during the stop, took any actions because of Plaintiffs' ethnicity. *See* Parish Dep. at 46. Second, Defendant Tosqui and Defendant Parish are both employees of the Detroit Police Department. Under the "intracorporate conspiracy doctrine," where all of the defendants are employees of the same entity, there are not two separate individuals to form a conspiracy. *See Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.,* 926 F.2d 505, 510 (6th Cir. 1991) (holding intra-corporate conspiracy doctrine precluded § 1985(3) claim against school district superintendent, the executive director of the district, and a school administrator, all of whom were agents of the school board); *Johnson v. Hills & Dales General Hosp.*, 40 F.3d 837, 840 (6th Cir. 1994) (holding intracorporate conspiracy doctrine barred employee's discrimination claim against hospital and its employees). Accordingly, the Court finds that Defendants are entitled to summary judgment on

35

Plaintiffs' conspiracy claim under 42 U.S.C. § 1985(3).


## V.  CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is hereby GRANTED.

IT IS SO ORDERED.



s/Lawrence P. Zatkoff         
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:  June 1, 2005




CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on June 1, 2005.

s/Marie E. Verlinde

Case Manager

(810) 984-3290

37